EDGAR T. BRACKETT, as Assignee, etc., Respondent, *v.* GEORGE HARVEY, Appellant.

A chattel mortgage is not rendered void, as to creditors of the mortgagor, by a provision authorizing him to sell the mortgaged property and apply the proceeds of sales toward the payment of the mortgage debt.

Nor does an authority to the mortgagor to sell on credit, taking good business paper, which the mortgagee agrees to accept and apply on the debt, affect the validity of the mortgage.

So also, permission to use a portion of the proceeds of sales to purchase other property does not vitiate the mortgage, where it is coupled with a condition that the property so purchased shall be brought in and subjected to the mortgage lien by a renewal of the mortgage.

But an agreement, although outside of the mortgage and oral simply, that the mortgagor may use a portion of the proceeds of sales for his own benefit, avoids the mortgage.

Such an agreement, however, must be proved; a mere expectation of one of the parties is not sufficient; it must appear that it had the conscious, concurrent assent of both.

In an action by an assignee in bankruptcy to set aside certain chattel mortgages executed by the bankrupt, it appeared that the mortgagor had authority to sell on credit, taking business paper, which the mortgagee agreed to accept as payment, also that the former had permission to invest a portion of the proceeds of sales in the purchase of other property, in which case renewal mortgages were to be given, covering such purchases. Payments were made from time to time, and renewal mortgages were given. It was claimed by plaintiff that sales were made of

the mortgaged property by the mortgagor to an amount more than sufficient to pay the mortgage debt, and that as against creditors it was to be considered as paid. One of the renewal mortgages was given after the alleged sales. It did not appear that any of the creditors represented by plaintiff were creditors at the time said mortgage was given. *Held*, that, as it did not appear that any adverse lien upon or right affecting the property existed at the time, it was competent for the parties to the mortgage to deal with each other in accordance with the actual condition of the indebtedness; and although sales had been made, the proceeds whereof were not applied, it was immaterial.

The doctrine of an agency in such case and of constructive payment simply applies in favor of a lien adverse to the mortgage, and may not be invoked where no such lien exists. As between the original parties the debt and security remain until actually paid.

Two other renewal mortgages were executed within two months prior to the filing of the petition in bankruptcy. *Held*, that as said mortgages were given in performance of the original contract, which ante-dated the two months, and as, therefore, the mortgagee had an equitable right to compel their execution, they were not unlawful preferences within the meaning of the Bankrupt Act, but were valid; and this, although taken with knowledge on the part of the mortgagee that the mortgagor was insolvent, in the absence of evidence that he knew that they were executed in fraud of the provisions of the Bankrupt Act.

But *held*, that this contract right to a lien upon newly-acquired property was confined to such as was purchased with the avails of property originally mortgaged, and if any of the property covered by the last two mortgages was not included in the prior mortgages and was not paid for out of such avails, as to such portion the mortgages were within the prohibition of said act.

*Brackett* v *Harvey* (25 Hun, 502) reversed.

(Argued December 15, 1882; decided January 23, 1883.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, entered upon an order made November 23, 1881, which affirmed a judgment in favor of plaintiff, entered upon a decision of the court on trial at Special Term. (Reported below, 25 Hun, 502.)

This action was brought by plaintiff, as assignee in bankruptcy of Frank E. Darrow and Mary J. Darrow, to have certain chattel mortgages executed by the bankrupts to defendant, adjudged void as to creditors, and to compel him to account for and pay over the value of the mortgaged property, which it was alleged had been taken and converted by him.

On November 29, 1873, the defendant, who was the lessee of a lumber yard in Saratoga Springs, and was owner of the fixtures, and of the stock of lumber therein, entered into an agreement with F. E. Darrow, by which he sold his interest in the lease and improvements to said Darrow, and also all the lumber. The purchase-money was made payable in installments. The contract provides that the purchase-price should be secured by Darrow's notes "and by chattel mortgage on the stock, and which chattel mortgage is to be renewed monthly." It was also further stipulated as follows: "And said Harvey also agrees that he will take business notes running sixty or ninety days, to be indorsed by said Frank E. Darrow, and apply the same in payment of Darrow's said notes as they fall due." In pursuance of said contract, Darrow executed and delivered to the defendant a chattel mortgage with schedule of lumber annexed. This mortgage covered all the lumber and stock sold, also the barn and other leasehold improvements. The mortgage recited that its execution was pursuant to contract given November 29, 1873. It was regularly filed in the clerk's office in Saratoga Springs. About three months subsequent to this purchase, Darrow entered into co-partnership with his mother, forming the firm of F. E. Darrow & Co. An addition was attached to the mortgage shortly after the formation of the firm, as follows: "The following items are hereby added to and made a part of the foregoing mortgage to secure the notes in said mortgage mentioned, pursuant to the agreement between the parties; and we direct that this statement be filed with the foregoing mortgage, and made a part thereof. Appended is a list of items of lumber referred to with firm signature or F. E. Darrow & Co." The mortgage was re-filed March 9, 1874. Another similar schedule was annexed and the mortgage was again re-filed May 4, 1874. On July 3, 1874, and September 18, 1874, similar annexations to this mortgage were made. Subsequently, in accordance with the original agreement, Darrow & Co. continued, periodically, to execute to the defendant chattel mortgages on their lumber in stock. Each of these last-mentioned mortgages contained

the recital that it was executed in pursuance of the original mortgage, and the preliminary contract. The following provision is contained in all: "And the said Frank E. Darrow & Co. covenant and agree that as said lumber and property is sold and disposed of by them, they will apply the proceeds thereof to the payment of the debt hereby secured." The last three were dated respectively, July 3, August 9, and September 7, 1875. The recital of the amount of the mortgage debt is $8,421.36 in all the last mortgages. All the property included in the August and September mortgages was covered by the mortgage of July 3, except one car-load of lath, valued at $200.34. The total amount realized at the sale was $5,814.26. In August, 1875, defendant took possession of the property covered by the mortgage remaining and sold it by virtue thereof. A petition in bankruptcy against F. E. Darrow & Co. was filed October 9, 1875, under which an adjudication was had December 7, 1875, and subsequently plaintiff was appointed assignee.

Further facts appear in the opinion.

*Harrington Putnam* for appellant. The express admission of consideration carried with it a concession of good faith. (*Groat* v. *Rees*, 20 Barb. 28.) The clause authorizing sales did not vitiate the mortgage, it being provided that the proceeds thereof should apply on the mortgage debt. (*Ford* v. *Williams*, 24 N. Y. 359; *Conkling* v. *Shelly*, 28 id. 360; *Miller* v. *Lockwood*, 32 id. 293; *Frost* v. *Warren*, 42 id. 204; *Caring* v. *Richmond*, 22 Hun, 369; *Dolson* v. *Saxton*, 11 id. 565, 569; Herman on Chattel Mortgages, § 103; *Robinson* v. *Elliott*, 22 Wall. 524.) Neither the execution nor the foreclosure of the mortgages contravened the bankrupt law. *Ex parte Jackson*, 1 Ves. Jr. 132; *Ex Parte Peele*, 6 Ves. 604; Pollock's Dig. of Part. 29; *Ryder* v. *Gilbert*, 16 Hun, 163; *Kennedy* v. *Nat. B'k of Watertown*, 23 id. 494; *Husted* v. *Ingraham*, 72 N. Y. 251; *Guernsey* v. *Miller*, 80 id. 181; *In re Hauck*, 17 N. B. R. 158; *Gattman* v. *Honea*, 12 id. 497; *Campbell Ass.* v. *White*, 16 id. 93; *Lincoln* v.

*Wilbur*, 125 Mass. 249.) The prior mortgages are not merged in the two mortgages in question. (*Hill* v. *Beebe*, 3 Kern. 556 ; *Morris* v. *Whitcher*, 20 N. Y. 41 ; *Walker* v. *Henry*, 55 id. 130 ; *Barrow* v. *Morris*, 14 N. B. R. 371 ; *Brett* v. *Carter*, id. 301.) The preference which defendant's claim has obtained is not fraudulent by common law. (*Miller* v. *Lewis*, 4 N. Y. 554, 559 ; *Williston* v. *Jones*, 6 Duér, 504 ; *Upton* v. *Bassett*, Cro. Eliz. 445 ; Coote on Mortgages, 261 ; *Meux* v. *Howell*, 4 East, 1 ; *Waterbury* v. *Sturtevant*, 18 Wend. 353 ; *B'k of Auburn* v. *Fitch*, 48 Barb. 344, 354 ; *Smith* v. *Skeary*, 47 Conn. 47.) The mortgaged property having come to defendant's possession before rights of creditors or third parties had intervened, his rights were complete. (*Brown* v. *Platt*, 8 Bosw. 324 ; *Mitchell* v. *Black*, 72 Mass. 100 ; *Hale* v. *Sweet*, 40 N. Y. 97, 101, 103 ; *Collins* v. *Lockwood*, 16 Conn. 376 ; *Congreve* v. *Evetts*, 10 Exch. 298 ; *Cragin* v. *Carmichael*, 11 N. B. R. 511, 515 ; *Field* v. *Baker*, 12 Blatchf. 443 ; *In re Jackson*, L. R., 4 Ch. Div. 682 ; *In re Waugh*, id. 527 ; *Kennedy* v. *Nat. B'k of Watertown*, 23 Hun, 494 ; *Chase* v. *Denny*, 130 Mass. 566 ; *Chipron* v. *Feikert*, 68 Ill. 284 ; *Cameron* v. *Marvin*, 26 Kans. 612 ; *Bismark B'ldg Ass'n* v. *Bolster*, 92 Penn. St. 123 ; *Summers* v. *Brannin*, 42 Miss. 749, 785 ; *Clark* v. *Tarbell*, 57 N. H. 328 ; *Nash* v. *Norment*, 5 Mo. App. 545.) Subsequent creditors are not in a position to compel a prior application of sales. (*Williston* v. *Jones*, 6 Duer, 504 ; *Southard* v. *Benner*, 72 N. Y. 424 ; *S. C.*, 5 Abb. N. C. 184 ; *Sawyer* v. *Turpin*, 91 U. S. 114 ; *Player* v. *Lippincott*, 16 N. B. R. 208 ; *White Int. B'k* v. *West*, 46 Me. 15 ; *People* v. *Bristol*, 35 Mich. 28, 33 ; *Barron* v. *Morris*, 14 N. B. R. 371 ; *Burdick* v. *Jackson*, 7 Hun, 488 ; *Gathman* v. *Hovea*, 12 N. B. R. 493, 495 ; *Ramsden* v. *Lupton*, L. R., 9 Q. B. 17.) The assignee in bankruptcy is subject to all equities that can be urged against a bankrupt. (*Stewart* v. *Platt*, 101 U. S. 731 ; *Douglass* v. *Vogeler*, 6 Fed. 53 ; Jones on Chattel Mortgages, § 241 ; *Stuart* v. *Beale*, 7 Hun, 405, 411 ; 68 N. Y. 629 ; *Jones* v. *Graham*, 77 id. 628.) Chapter 314 of the Laws of 1858, authorizing an assignee or other trustee for the

benefit of creditors to disaffirm and resist transfers, acts and agreements, and maintain actions for that purpose, is applicable only to cases of actual fraud. ( *Underwood* v. *Sutcliffe*, 77 N. Y. 58, 62 ; *Porter* v. *Williams*, 5 Seld. 142 ; *Southard* v. *Benner*, 72 N. Y. 424 ; 5 Abb. N. C. 184 ; *Booth* v. *Kehoe*, 71 N. Y. 341 ; *Bismark B'ldg Ass'n* v. *Bolster*, 92 Penn. St. 123 ; *Stevens* v. *Sale*, 1 Atk. 170 ; *In re Collins*, 12 Bank. Reg. 379 ; *Stuart* v. *Platt*, 101 U. S. 731 ; *In re Perrine*, 7 N. B. R. 283 ; *In re Kalley*, 4 Bank. Reg. 378 ; *Whiston* v. *Smith*, 2 Low. Dec. 101 ; *Coman* v. *Lackey*, 80 N. Y. 345 ; *Hammond* v. *Hudson River Iron & Manuf. Co.*, 20 Barb. 378 ; *Gray* v. *Schenck*, 4 N. Y. 460.)

*Samuel Hand* for appellant. The license to sell vitiated the mortgages. (*Southard* v. *Benner*, 72 N. Y. 424 ; *Mittnachtt* v. *Kelly*, 3 Keyes, 407 ; *Edgell* v. *Hart*, 5 Seld. 213 ; *Russell* v. *Winnie*, 37 N. Y. 595, 596, 598 ; *Smith* v. *Ely*, 10 Bank. Reg. 553, 561 ; *Wagner* v. *Jones*, 7 Daly, 375 ; *Dodds* v. *Johnson*, 3 N. Y. Sup. Ct. 216 ; *City B'k, etc.*, v. *Westbery*, 16 Hun, 458 ; *Robinson* v. *Elliott*, 22 Wall. 513 ; *Mobley* v. *Letts*, 61 Ind. 11 ; *Davenport* v. *Foulke*, 68 id. 382 ; *Barnet* v. *Fugus*, 51 Ill. 352 ; *Simmons* v. *Jenkins*, 67 id. 479, 483 ; *Collins* v. *Myers*, 16 Ohio, 547 ; *Blakeslee* v. *Rossman*, 43 Wis. 116 ; U. S. Rev. Stat., § 5046.) As neither the contract itself nor the first mortgage contained any agreement on the part of the mortgagors to apply the proceeds of sales upon the mortgage debt, the original arrangement was fraudulent as to creditors. (*Conkling* v. *Shelly*, 28 N. Y. 360, 363 ; *Smith* v. *Ely*, 10 Bank. Reg. 553, 562 ; *Hawkins* v. *First Nat. B'k*, 2 id. 337, 340.) The last two chattel mortgages and the assignments of the accounts mentioned in the complaint, if not fraudulent and void as to creditors at common law, were void under The Bankrupt Act because they were taken by Harvey out of the ordinary course of business, and in violation of its provisions as preferential securities within two months prior to the filing of the petition on which Darrow & Co. were adjudicated bankrupts, Harvey knowing of their insolvency at the

time. (Bump on Bankruptcy [8th ed.], p. 791, § 5128 ; Bankrupt Act, §§ 35, 39 as amended in 1874; Gazzam on Bankruptcy [4th ed.], 279, 280 ; *Wells* v. *March*, 30 N. Y. 350, 351 ; *Webb* v. *Sachs*, 15 Bank. Reg. 169 ; *Jackson* v. *McCulloch*, 13 id. 283 ; *Warren* v. *Tenth Nat. B'k*, 10 Blatchf. 493 ; *Webb* v. *Sachs*, 15 Bank. Reg. 168 ; *Cuyler* v. *McCartney*, 40 N. Y. 222 ; *Dewey* v. *Moyer*, 72 id. 70, 80 ; *Conkling* v. *Shelly*, 28 id. 360, 364 ; *Sutton* v. *Dillaye*, 3 Barb. 529 ; *Graham* v. *Stark*, 3 Bank. Reg. 357 ; *Mayar* v. *Herman*, 10 Blatchf. 257, 263 ; *Fox* v. *Gardner*, 12 Bank. Reg. 138 ; *Webb* v. *Sachs*, 15 id. 168.) There was no error in allowing the entries in Darrow & Co.'s books to be proved. (*Russell* v. *Hudson R. R. R.*, 17 N. Y. 134 ; *March* v. *Shultz*, 29 id. 346.)

FINCH, J. The two mortgages assailed by the assignee in bankruptcy were not void on their face, and as a legal conclusion from their express terms. Reading them, as both parties do, in connection with the original agreement of sale, and as steps in its performance, they permitted but three things, to one of which the other two were merely incidental, which differed from the ordinary stipulations of a chattel mortgage. The mortgagors were left at liberty to sell and dispose of the mortgaged property, but upon a condition involved in their covenant, that they would apply the proceeds of such sales to the payment of the debt which the mortgage secured. As subsidiary to this general provision, the two others may be fairly gathered from the agreements taken together : that the mortgagors might sell on credit, taking good business paper having sixty to ninety days to run, and which paper the mortgagee would accept and apply on the debt; and that the mortgagors might use a part of the avails of the sales to replenish and freshen their stock, but if they did, the substituted property was to be placed, by monthly renewals of the mortgages, in the room and stead of that which was sold to procure it. If we state these latter stipulations somewhat differently from the version of them given by the appellant, we are yet convinced that no other or wider statement of them is a just inference from the provisions of the original contract.

Three cases decided in this court in rapid succession held · that a chattel mortgage was not *per se* void because of a provision contained in it allowing the mortgagor to sell the mortgaged property, but accounting to the mortgagee for the proceeds, and applying them to the mortgage debt. (*Ford* v. *Williams*, 24 N. Y. 359 ; *Conkling* v. *Shelley*, 28 id. 360 ; *Miller* v. *Lockwood*, 32 id. 293.) · These cases went upon the ground that such sale and application of proceeds is the normal and proper purpose of a chattel mortgage, and within the precise boundaries of its lawful operation and effect. It does no more than to substitute the mortgagor as the agent of the mortgagee to do exactly what the latter had the right to do, and what it was his privilege and his duty to accomplish. It devotes, as it should, the mortgaged property to the payment of the mortgage debt. And the further doctrine of one of these cases, that under such a stipulation the proceeds realized by the agent are to be deemed realized by the principal, and as against an adverse lien, are to be applied on the mortgage debt even though not actually paid over (*Conkling* v. *Shelley, supra*), shows how impossible it is that any fraud, or injury to others, can be imputed to the agreement. If the mortgagor sells, and actually pays over the whole proceeds, nobody is harmed, for that only has happened which is the proper and lawful operation of the mortgage. If, on the other hand, such proceeds have not been paid over, the adverse lien is still unharmed, for, as against it, such proceeds are deemed paid over and applied in reduction of the mortgage debt, although as between mortgagor and mortgagee the debt remains, and is still unpaid. The effect we have thus given to the stipulation under discussion has received the approval of the Federal court, in a case where the whole subject was deemed open, and the true rule at liberty to be sought out, unhindered by decisions often conflicting and said to be impossible to reconcile. (*Robinson* v. *Elliott* 22 Wall. 524.) While holding that provisions which allow the mortgagor to sell for his own benefit are necessarily fraudulent, since they strip the mortgage of its whole force as a security to the holder, and

make it merely a shield to the debtor, the court carefully quali-
fied its judgment by adding that such results did not follow
where the sales were to be for the benefit of the mortgagee,
and their proceeds to be paid over to him.   Nor does the re-
cent case in our own court of *Southard* v. *Benner* (72 N. Y.
424) question this doctrine.   In that case there was no agree-
ment to sell for the benefit of the mortgagee, and apply the
proceeds to the debt.   The trial judge charged that if the
mortgagees knew of the sales, but supposed the money was to
be applied on the debt, there was no fraud in law; and the de-
cision went upon the ground that the jury had found, and there
was evidence to justify it, that the mortgagor was permitted, by
the conscious assent and agreement of the mortgagee, to sell
the property as he pleased for his own benefit, precisely as if
the mortgage had no existence.   We see no reason to doubt
that on their face the mortgages here assailed were valid un-
less the two incidental or subsidiary facts operated to modify
the result.   The first of these was the implied permission to
sell for good business paper, running sixty or ninety days,
which paper the mortgagee was to take and apply on the debt.
This stipulation is an inference from the provision of the con-
tract by which Harvey agreed to accept such business paper as
cash.   No express liberty to sell the mortgaged property on
credit was given, and the only proper inference of such liberty
to be drawn as it respects sales of the mortgaged property is
that which we have stated.   It was thus a provision in entire
harmony with the covenant to apply all sales to the mortgage
debt.   If the sales were for cash, that was to be paid over; if on
a credit of sixty or ninety days secured by good business paper,
that was to be at once taken as cash and applied as cash.   No
permission to sell in any other way was given or can be in-
ferred from the contract, and that actually given made the
paper permitted to be taken cash as between the parties, to be
at once applied upon the debt.   We do not see how such a
provision can be said to affect injuriously the rights of other
creditors.   It can only become dangerous by straining it be-
yond any just inference, and construing it to be a general per-

mission to sell on credit without limitation. The second incidental fact is the implied permission to use proceeds for replenishing the stock; the goods bought to be substituted in the mortgage for those sold. This again is an inference from the stipulation in the original contract for monthly renewals. These could only be necessary to bring in after-acquired property, and permission to acquire it with proceeds of sales is perhaps a just'inference, but then only upon condition that the substituted property be brought in and subjected to the mortgage lien. Thus understood it provides only for a shifting of the lien from one piece of property to another taken in exchange. In no respect did it permit any thing mortgaged to escape the mortgage. If it did not turn into cash or paper, which reduced the mortgage debt, it turned into other property, which became itself the subject of the mortgage lien. We think, therefore, that on the face of the papers, giving them a fair and just construction, there was nothing which constrains us to deem them fraudulent in law.

But the contention of the assignee does not stop with the inferences to be drawn from the papers themselves. He insists that outside of them there was evidence of an agreement between the parties, by the terms of which the mortgagors were permitted to use the proceeds of sales in part to meet the expenses of the business and for the support of the mortgagors and their families. Such an agreement, made at the time of the written one, but outside of it and by parol, we held in *Southard* v. *Benner* (*supra*), might be proved and serve to establish a fraudulent purpose; and the learned trial judge has found as a fact that at the date of the contract and of the several mortgages executed pursuant thereto, " it was understood and expected by all of the parties thereto, that the avails of the sales made in said business were to be used in the transaction of said business in paying the personal expenses of the said Frank E. Darrow and of the members of said firm, including their own and their families' support and maintenance." If there was evidence to sustain this finding, it is necessarily fatal, for such an agreement opens the door to fraud, and permits the

mortgagor to use the property for his own benefit, utilizing the mortgage as a shield against other creditors. To this finding of the trial court the appellant specifically excepted, and the inquiry now is, whether there is any evidence to sustain it.

We must not forget that it is an agreement which is to be proved. The mere expectation of one party or the other is not enough : it must be the conscious, concurrent assent of both. It must be proved and not merely suspected, for it is an attempt to establish fraud where innocence is to be presumed, and to contradict, by parol, the actual written agreement of the parties, and reduce that to a mere cover and artifice. When we examine the proofs, it becomes apparent that no such actual agreement was directly made. No conversation upon the subject took place. The matter was never discussed. No words were ever exchanged which conveyed such assent from one to the other. We come down at once to indirect proof, and into the region of inference. When there, we find but two sorts of evidence : one, the alleged expectation of Harvey ; the other his knowledge of the conduct of Darrow & Co. and of their modes of doing business. The evidence as to Harvey's expectation was very brief and was this: To the question, " did you understand that Darrow was to go on and sell the lumber so transferred by you to him ? " he answered, " yes ; and he did so, as I understand, agreeing to pay me the proceeds, and *he paid me the proceeds* as fast as he received them, *except* what he used in replenishing his stock." Here the agreement is stated, and the fact which followed it. All the proceeds of sales of the mortgaged property were to be paid over, and as Harvey understood were so paid except what was used to buy new stock. He was then asked, " did you understand that he used a share or portion of the *proceeds of the business* for his own and his family's support ? " Observe the point of this inquiry. It does not ask what was the agreement of the parties. That had already been stated and was written out in the mortgages subsequently given, and was inconsistent with any right of the mortgagors to divert the proceeds of the mortgaged property to their own support. The inquiry is limited to the separate

action of one of the parties, which might prove to be a violation of the agreement.   And then, too, it is the use made of a portion of the proceeds "*of the business*" and not of the proceeds of the property mortgaged, which is the subject of the inquiry.   The witness answered: "I suppose he used the profits of the business for their support."   This is a statement, not of his supposition when he made the contract, or when any mortgage was given, of what Darrow would do, but merely of his supposition at the moment of his testimony, and in the light of all which had been developed, of what Darrow in fact had done.   And even that supposition relates to the business and the business *profits*, and not to the proceeds of the mortgaged property.   Profits could only arise after the payment of debts. They could not arise out of sales of the mortgaged property until the debt representing its cost was paid.   The profits realized would be the surplus remaining.   Then too it was the profits of the business to which the witness referred. It is said, however, that the mortgagors must have lived out of the proceeds of the mortgaged property, because there was nothing else upon which they could have lived, and Harvey must have known the fact and, not objecting, be held to have assented. This is the general view of the case founded upon the facts occurring.   We think the proposition is not sound.   There were proceeds of the business outside of sales of the mortgaged property upon which Darrow & Co. could have lived without touching the latter.     The purchase-price of that was about $23,000.   Deducting from it the cost of the leasehold improvements, which appears to have been $6,250, it leaves of lumber to be sold about $17,000 at the commencement of the business. But the actual sales of the first year are estimated at $58,000 or nearly four times the cost of the original lumber, and while some part of the new lumber purchased went into the mortgage by additions, yet there is no ground for supposing that the whole of it did.   The original mortgage was given in December of 1873, and the first addition to its schedule was in March of 1874.   During the interval of three months there may have been, and judging from the size of the business, there.

must have been, many purchases and sales, the proceeds of which latter were in no manner bound by the mortgage, and could be used by Darrow & Co. as they pleased, although the understanding existed by parol which at the end of the interval was written out in the mortgage. Another period of four months intervened between mortgages C and D, and other intervals, some of two months and others of one occurred. There must have been, therefore, proceeds of the business not bound by the mortgage upon which Darrow & Co. could have lived, and that they did so is made more probable by the fact that in the end they prove to be in debt beyond the mortgage in a sum of about $12,000, or much more than enough to account for their living and business expenses without at all trenching upon proceeds of the mortgaged lumber. And again, we find no evidence that these proceeds were, in fact, diverted from their lawful application. Harvey says they were not to his knowledge, and Darrow does not say that they were; so that there is no foundation in the facts which occurred in the transaction of the business for any inference of an agreement to divert the proceeds of the mortgaged property. We see no evidence of an agreement for such diversion, or of such diversion in fact. The debt of the mortgagee was an honest debt. Its security by chattel mortgage was just and right. Both parties have sworn that there was no fraudulent intent. The mortgagee was at times lenient, desiring the success of his debtors, but all the time supposed, and had good reason to suppose, that the property mortgaged, or that bought by its proceeds, was being steadily appropriated to the payment of the mortgage debt, until just before his seizure of the property remaining, and that seizure was made promptly upon the discovery that the security was lessening. The whole transaction impresses us as honest and just, and we cannot assent to the conclusion that it was fraudulent and void.

But the respondent still defends the judgment by seeking to apply to the case the doctrine of *Conkling* v. *Shelley* (*supra*). He argues that, on the assumption of the validity of the mortgages, there was nevertheless enough realized from the sales

of the mortgaged property to have paid them in full, and such proceeds must be deemed to have been so applied, as against the assignee in bankruptcy representing creditors. Without considering the question of the actual foreclosure and possession by the mortgagee, before the filing of the petition in bankruptcy; and granting, as was held in *Southard* v. *Benner* (*supra*), that the assignee, representing the whole body of creditors, stands in the same position toward alleged fraudulent incumbrances as a single creditor having a lien by judgment and execution, there are still sufficient answers to the respondent's contention. He has no adequate facts as a foundation. What he relies upon, and all that he relies upon, is the estimate of Darrow that the sales of the first year reached $58,000 and the actual receipts $50,000; and the sales of the second year were $20,000 and the receipts $10,000. But these, as we have seen, were proceeds of the whole business, not of the mortgaged property alone. They were not all bound to be applied. What proportion of them came from sales of the mortgaged lumber is not shown, and we do not know. It is not made to appear that a single dollar was received from this source which was not applied as received upon the mortgage. On the contrary, the evidence indicates that it was. But whatever may be the truth, it is enough to say that we have no facts from which to infer a misapplication of any specific amount which therefore needs to be credited as a payment upon the mortgage. There is this further answer to the proposition. The creditors whom the assignee represents are not shown to have been creditors when the mortgage of July, 1875, was given. So far as we have a list of them, their debts matured thirty days and longer after that date. When contracted we do not know, but at least there is an entire absence of proof that any of them existed at that date. When that mortgage was given there was thus no adverse lien affecting, on any theory, the property, and it was entirely competent for mortgagor and mortgagee to deal with each other according to the actual facts. They did so deal, and whether moneys had been realized and misapplied or not was immaterial to the dealing, since nobody

is shown to have been in a position to raise the question. When the new mortgage was then given it fixed and secured the debt remaining unpaid, and was valid for the full amount. We do not approve the contrary doctrine of the General Term upon this point. It proceeds upon the idea of a payment as between mortgagor and mortgagee, which is sufficient *pro tanto* to cancel the mortgage debt, and leaves to the mortgagee only an unsecured claim against his agent for moneys misapplied. But, as between them, they remain mortgagor and mortgagee, with the original debt unpaid and its security unaffected. The doctrine of an agency and a constructive payment simply describes and enforces the equity of a lien in collision, and has no existence except as incidental to that. In its absence, and as between the original parties, both debt and security remain. Harvey sold under the July mortgage as well as the others, and may rely upon it to defend his title, and in so doing cannot be charged with prior sales even if unapplied, nor with subsequent sales, since none are shown to have been made. The constructive payment equitably asserted for the benefit of an adverse lien can never apply where such lien does not exist, and the question is wholly between the original parties. That appears to have been the situation when the July mortgage was given, and limits the possibility of constructive payments to a period subsequent to its date, and to justify those there is no evidence. We must, therefore, hold that the ground of constructive payment is not tenable.

The respondent's final reliance is upon the provisions of the Bankrupt Act. The mortgages of August and September were executed within two months of the filing of the petition of bankruptcy, and are, therefore, claimed to have been unlawful preferences. The Special Term decided against this contention upon the ground that the mortgages were given in execution of the original contract, and the mortgagee had an equitable right founded upon that contract, and long antedating the prescribed two months, to compel the execution of such mortgages. The General Term did not dispute this ruling, but rested its conclusion upon a different ground. We

think, in this respect, the courts below were right. The preference which Harvey obtained was in fact given to him and secured by the terms of the original contract. The later mortgages were but details of its execution, and gave him no new preference, since in equity, where that which is agreed to be done is treated as done, the preference already existed and could have been enforced. The cases cited by the trial court and upon the brief of the appellant fully justified this conclusion. But our construction of the original contract makes a further observation necessary  We confine the contract right to a lien upon newly-acquired property to such as was bought with the mortgage proceeds, and became incumbered by substitution. It was shown that some of the property described in the August mortgage was bought on credit and not paid for, and so was not within the purview of the original agreement. But if that be true, it is also true that the mortgage of July which preceded the petition in bankruptcy by more than the prescribed two months covered all the property specified in the later mortgages, except items amounting to about $200. That mortgage was unaffected by the prohibition of the Bankrupt Act; the sale was made under it as well as the others, and it may be relied upon in defense of Harvey's title. And if the items of the $200 were paid for out of sales of mortgaged property, they also are protected upon the ground first stated.

It is further urged that the August and September mortgages were taken by Harvey out of the usual course of business, and with knowledge that Darrow & Co. were in fact insolvent, and the trial court has so found. But this finding was made in April, 1879, and before the decision in this court of *Guernsey* v. *Miller* (80 N. Y. 184), which was rendered in February of the next year. We held in that case that the Federal statute as amended (U. S. R. S., § 5128) requires proof to avoid an assignment that the assignee received it, not only with "reasonable cause to believe" that the assignor was insolvent, but "knowing that such assignment was made in fraud of the provisions" of the act; and that such knowledge required more cogent evidence than mere belief. We find no

proof of such knowledge. The facts relied upon are that Harvey made repeated extensions; that he sued the firm and recovered a judgment, and that he examined their books and business condition. The extensions were provided for in the original arrangement, and were matters of anticipated convenience. It was represented to Harvey, as he says and as Darrow admits, that the firm or some members of it had real estate in Virginia worth $6,000, which they expected to sell and apply the proceeds on their purchase, but should need extensions if that fund was not realized in time. There was nothing in those extensions which indicated or tended to indicate insolvency under the existing circumstances. The judgment which Harvey recovered appears to have been upon business paper turned out to him by Darrow & Co., and which they indorsed. It is certainly possible that the suit was brought with a view to enforce collection against the makers and so relieve the indorsers, and that the latter were not expected to pay until all remedies against the makers were exhausted. The attempted proof of an examination of the books of the firm by Harvey ended in substantial failure. Darrow testified, " I saw Mr. Harvey at the yard one hundred times; he asked how we were getting along; I presume we told him something about it; I have seen him with my books two or three times; I cannot give the dates; father and Mr. Walker looked over with Mr. Harvey; I did not." Harvey testified, "I had no knowledge that Darrow & Co. were insolvent at the time I took the mortgage or took possession of the mortgaged property; I had no intent to defeat the operation of the Bankrupt Law." Darrow again said that the firm was embarrassed "at latter end and for a few weeks before they closed." Walker testified that " Harvey did not look over the books to see how the affairs stood." And again, " Harvey did talk to me a few times about their business; he asked me how they got along, and I said as they could expect, under the circumstances; that they were getting along very well; I did not go into details with him." On this state of facts it is impossible to say that the proof established even a reasonable cause for a belief

by Harvey of the firm's insolvency, and still less of knowledge by him of an intent to work out a fraud upon the provisions of the Bankrupt Act.

It is not necessary to consider the questions growing out of the assignment of accounts. Enough has been said to show that a new trial must be had, and when that occurs it may appear, what at present is left in doubt, whether these accounts represented sales of mortgaged property in whole or in part, when and how they were payable, and whether or not they were taken absolutely at their face or otherwise. The evidence relating to them is very brief and somewhat confused. It seems best, therefore, to leave that question open for the effect of further evidence.

The judgment should be reversed and a new trial granted, costs to abide event.

All concur.

Judgment reversed.