In re MARINE CONSTRUCTION & DRY DOCK CO.

(District Court, E. D. New York. March 22, 1905.)

CHATTEL MORTGAGE—VALIDITY—AGREEMENT FOR SALE AND REPLACEMENT OF PROPERTY BY MORTGAGOR.

A mortgage given by a shipbuilding company on its plant, machinery, tools, and stock of material for money borrowed expressly for use in carrying on its ordinary business of building and repairing vessels, which mortgage by its terms, or by necessary intendment from such purpose, permits the company to use the stock mortgaged and replace the same, is void as to such stock and as to a boat made therefrom for a customer both under the federal and New York decisions, and the mortgagee has no lien on such stock or the boat or its proceeds as against the company's trustee in bankruptcy.

In Bankruptcy. On distribution of proceeds of bankrupt's property.

David B. Simpson, for petitioners.
David Bennett King, for trustee.

THOMAS, District Judge. The bankrupt corporation was organized for the purpose of doing a general manufacturing business, and was for that purpose, on September 1, 1902, the owner of land and a shipbuilding plant at Staten Island, subject to a mortgage of $40,000. At that date it executed to the Guaranty Trust Company a mortgage to secure $37,500 of bonds, and on September 25, 1903, executed a mortgage to secure $11,000 of notes. The notes and bonds are now owned by petitioners. The second and third mortgages (to which alone reference is hereafter made in the use of the word "mortgages") each contain a description of the land, and also—

"All the dry docks, marine railways, piers, docks, wharves, rails, wires, lumber, iron, steel, metals, timber, coal, motors, machinery, boilers, furnaces, house, engines, work-shops, stock, tools, implements, materials, improvements, boats, vessels, ships, barges, scows, tenements and hereditaments now owned by the Manufacturing Company or hereafter at any time or howsoever acquired by it.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Together with all and singular the liberties, privileges and franchises connected with or relating to the Manufacturing Company's property, real and personal hereby mortgaged, which are now or may hereafter be owned, possessed, enjoyed or exercised by the Manufacturing Company, with all and singular the tolls, income, profits, advantages, hereditaments, easements, appurtenances to the above described and hereby mortgaged Manufacturing Company's real and personal properties, franchises and premises, in the County of Richmond, or in the City of New York, or in the State of New York, or elsewhere or any part thereof, now or hereafter belonging or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and also all the estate, right, title, interest, property, possession, claim and demand whatsoever as well in law as in equity of the Manufacturing Company, in and to the same and each and every part thereof, with the appurtenances."

Proceedings in bankruptcy were instituted against the bankrupt on December 31, 1903, and thereupon a receiver appointed in such proceedings took possession of all its property. A trustee, duly elected and qualified, continued such possession, and either the receiver or trustee

sold all the property of the estate, free from the liens of the mortgages, either in the course of the business or at public sale, and the question now present is to what extent the mortgages are a lien upon the proceeds. For the purposes of the present decision, the mortgages are liens upon the proceeds of sale to the same extent as upon the property itself, subject to certain expenses of administration, concerning which there is no controversy, and, as to the houseboat hereinafter mentioned, subject to any lien that may be established by Froment & Co.

The petitioners purchased the real estate subject to a first mortgage for the sum of $3,000, and made payment therefor by delivering a similar amount of the first-mortgage bonds to the trustee, and also provided for the payment of the trustee's commissions and expenses of sale. This is approved.

The petitioners are also entitled to the benefit of the sale of the office furniture, tools, machinery, and appliances, which sold for the sum of $2,000.

This leaves in dispute the proceeds of the sale of the stock sold by the receiver and trustee in the conduct of the business, amounting to the sum of $2,027.45, and the proceeds of the remainder of the stock and materials, amounting to $4,800, and $6,000 collected by the trustee from one Emerson on a contract for the construction of a houseboat, which was completed, but not delivered, at the time the bankruptcy proceedings were instituted. For present purposes, it will be assumed that all the stock and materials were on hand at the time both mortgages were given. In the year 1903 the company contracted with Emerson to construct for him a houseboat, at the agreed price of $35,000, whereof $22,500 was paid prior to the possession of the receiver in bankruptcy. The question is whether the mortgages are valid, as against the trustee in bankruptcy, as to the material which, as will hereafter appear, the mortgagor was empowered to use and to sell for the purposes of its business, and not for the benefit of the mortgagees. This question must be determined in view of the decisions of the federal courts and of the Court of Appeals of the state of New York.

The decision of Judge Story, in Mitchell v. Winslow, 2 Story, 630, 17 Fed. Cas. 527, will be considered. The mortgage was of machinery in and belonging to the mortgagor's factory—

"With all the tools and implements of every kind thereunto belonging and appertaining, together with all the tools and machinery for the use of said manufactory, which we may at any time purchase for four years from this date, and also all the stock which we may manufacture or purchase during said four years. * * * Provided that it shall be lawful for the mortgagors prior to default to hold and enjoy * * * the premises hereby granted, and to secure and take the rents and profits therefor, to and for their own use and benefit."

The question was whether after-acquired machinery, tools, and stock in trade taken by the mortgagee before bankruptcy proceedings belonged to the purchaser or the assignee in bankruptcy, under the bankruptcy act of 1841. Judge Story decided: (1) That the assignee, in absence of fraud, takes only such right and interest as the bankrupt himself had and could assert at the time of his bankruptcy, and that all equities affected alike the rights of the mortgagor and his assignee in

bankruptcy. (2) That the mortgage as to the after-acquired property in question was valid as against the mortgagor, and hence against the assignee. (3) That an assignment of property not in esse takes effect and attaches as soon as it comes into being, and as such may be enforced in equity, and he refers to the assignments of contingent interests, possibility of inheritance, the freight of an intended future voyage, etc. (4) That there was neither actual nor constructive fraud, nor was the mortgage inoperative by reason of the agreement that the mortgagor should retain the possession and use of the property and take the rents and profits thereof, and sell the stock in trade and other mortgaged property, for, as he states, in case of sale the proceeds or other equivalent property may be substituted, if the parties consent thereto; and cites Abbott v. Goodwin, 20 Me. 408. This holding may be compared with later decisions.

In Robinson v. Elliott, 89 U. S. (22 Wall.) 513, 22 L. Ed. 758, the mortgage contained the following stipulation:

"And it is hereby expressly agreed that until default shall be made in the payment of some one of said notes, or some paper in renewal thereof, the parties of the first part may remain in possession of said goods, wares, and merchandise, and may sell the same as heretofore, and supply their places with other goods, and the goods substituted by purchase for those sold shall, upon being put into said store, or any other store in said city where the same may be put for sale by said parties of the first part, be subjected to the lien of this mortgage."

The instrument then concluded with power to the mortgagee, upon any default, to enter into said store of the firm and take possession of a sufficient amount of goods to satisfy, pay, and discharge all the paper due, and, upon 10-days' public notice, to sell at public auction such amounts of said goods as should be necessary to pay said paper. The court held that the mortgage was void. The question arose, in equity, between the mortgagee and the assignee in bankruptcy. The mortgagees had seized the goods September 15th, and were about to sell, but, September 26th, bankruptcy proceedings were begun, and therein the sale was enjoined. The court recognized the validity of a bona fide agreement, upon good consideration, whereby the mortgagee is permitted to retain possession of the mortgaged goods, and even to sell the same for the benefit of the mortgagee, but states that the law—

"Will not allow the creditor to make use of his debt for any other purpose than his own indemnity. If he goes beyond this, and puts into the contract stipulations which have the effect to shield the property of his debtor, so that creditors are delayed in the collection of their debts, a court of equity will not lend its aid to enforce the contract. * * * Manifestly it [the mortgage] was executed to enable the mortgagors to continue their business and appear to the world as the absolute owners of the goods, and enjoy all the advantages resulting therefrom. It is idle to say that a resort to the record would have shown the existence of the mortgage, for men get credit by what they apparently own and possess, and this ownership and possession had existed without interruption for ten years. There was nothing to put creditors on their guard. On the contrary, this long-continued possession and apparent ownership were well calculated to create confidence and disarm suspicion. But apart from this, security was not the leading object. If so, why does Mrs. Sloan's note remain overdue for twenty-one months, and why does Robinson continue to indorse? This conduct is the result of trust and confidence, which, as Lord Coke tells us, are ever found to constitute the apparel and cover of fraud. In truth, the mortgage, if it can be so called, is but an

expression of confidence, for there can be no real security where there is no certain lien. Whatever may have been the motive which actuated the parties to this instrument, it is manifest that the necessary result of what they did do was to allow the mortgagors, under cover of the mortgage, to sell the goods as their own, and appropriate the proceeds to their own purposes, and this, too, for an indefinite length of time. A mortgage which, in its very terms, contemplates such results, besides being no security to the mortgagees, operates in the most effectual manner to ward off other creditors; and, where the instrument on its face shows that the legal effect of it is to delay creditors, the law imputes to it a fraudulent purpose. The views we have taken of this case harmonize with the English common-law doctrine, and are sustained by a number of American decisions. In the American editor's note to Twyne's Case (in 1 Smith, Lead. Cas. p. 52 [7th Am. Ed.]) most of the cases in this country on the subject are collected and classified. * * * Finally, it is insisted, if the mortgage is held void in law, still the delivery of the goods in pledge vests a sufficient lien, prima facie, to enable the appellants to enforce their lien in equity. The answer to this is that the case made by the bill does not proceed upon such a delivery at all, but upon the mortgage and seizure under it. Besides, if the appellants could turn the proceeding into a voluntary pledge by the debtors, it would not help them, for it would violate the preference clause of the bankrupt act, as they got the goods only twelve days before the petition in bankruptcy was filed."

This case should be read in connection with Southard v. Benner, 72 N. Y. 424. That action was brought by the plaintiff, as assignee in bankruptcy of one Decker, bankrupt, to recover the proceeds of the sale of lumber seized by defendants before the bankruptcy proceedings, pursuant to the terms of a chattel mortgage executed to them by Decker. The trial court charged the jury that if they found it was the understanding of the mortgagor and mortgagee, at the time the mortgage was made, that the mortgagor was to go on and sell part of the lumber and use the money generally in his business, that was fraudulent in law, and that the understanding might be inferred if the defendant had permitted the sales to be made as alleged. The Appellate Court held that the charge was correct, and that such arrangement, found by the jury to have been made, invalidated the mortgage. The opinion states:

"Such an arrangement is incompatible with a mortgage designed only as security to the mortgagee. The dealing with the mortgaged property as merchandise by the mortgagor, and the sale of the same, in the ordinary course of business, as a merchant with the consent of the mortgagee, necessarily destroys the value of the mortgage as a security, and makes it only available, if for any purpose, so long as this arrangement and dealing continued to protect the property from creditors, and secure it to the mortgagor. Such a transaction is necessarily fraudulent. It hinders and delays other creditors, without securing the application of the property or its avails to the payment of the mortgage debt."

The opinion distinguishes Frost v. Warren, 42 N. Y. 204, where the mortgagor sold with knowledge of the mortgagee, but not pursuant to agreement with him, and notices that in Edgell v. Hart, 5 Seld. 213, 59 Am. Dec. 532, it had been held that, where such arrangement was included in and made a part of the written instrument of mortgage, the mortgage was fraudulent in law, and thereupon states:

"Whether the agreement is in or out of the mortgage, whether verbal or in writing, can make no difference in principle. Its effect as characterizing the transaction would be the same. The difference in the modes of proving the agreement cannot take the sting out of the fact and render it harmless. If

It is satisfactorily established, the result upon the security must be the same. It is the fact that such an agreement has been made and acted upon that in law condemns the security, and not the fact that it is proved by the instrument of suretyship, instead of by parol or in some other way. This question is considered by Judge Denio in Gardner v. McEwen (19 N. Y. 123), and by Judges Grover and Woodruff in Russell v. Winne, 37 N. Y. 591, 97 Am. Dec. 755, and, although not expressly decided in either case, it is very conclusively shown by the reasoning of those learned judges that an agreement by which the mortgagee is permitted to deal with the mortgaged property, outside of the mortgage, and proved by parol, is equally fatal to the security as if made a part of the written mortgage."

The court further held:

"A creditor by simple contract is within the protection of the provision of the statute of frauds, declaring every conveyance or transfer of chattels, not followed by actual and continued change of possession, to be presumptively fraudulent (2 Rev. St. [1st Ed.] p. 136, §§ 5, 6) as against the creditors of the vendor or assignor; but until he has a judgment and a lien, or a right to a lien, upon the specific property, he is not in a condition to assert his rights as a creditor.

"The act of 1858 (chapter 314, p. 506, Laws 1858), however, which authorizes an assignee or other trustee of an estate of an insolvent, for the benefit of creditors and others interested, to disaffirm and treat as void all transfers in fraud of their rights, and to maintain all necessary actions for that purpose, dispenses with the necessity of any special or other lien in behalf of individual creditors; and an action by such a trustee to annul a fraudulent transfer, and to recover the property or its avails, may be brought for the benefit of simple contract creditors. An assignee in bankruptcy may maintain such an action."

The court distinguishes the Collins Case, 12 Blatch. 548, Fed. Cas. No. 3,007, where the defect was in filing the mortgage. The decision in the New York Economical Printing Co., 110 Fed. 514, 49 C. C. A. 133, also related to a failure to file the mortgage pursuant to the statute.

In connection with Southard v. Benner, Brackett v. Harvey, 91 N. Y. 214, should be considered. The suit was brought by the plaintiff, as assignee in bankruptcy of Darrow & Co., to have certain chattel mortgages executed by the bankrupts to the defendants adjudged void as to creditors, and to compel the latter to account for and pay over the value of the mortgaged property alleged to have been taken and converted by him. In 1873, the defendant, lessee of a lumber yard and owner of the fixtures and stock therein, sold to one Darrow his interest in the lease and improvements and all the lumber. The agreement of sale provided for payments in installments, and that the purchase price should be secured by Darrow's notes, and by a chattel mortgage on the stock, to be renewed monthly, and that the vendor would take business notes running 60 or 90 days, to be indorsed by Darrow, and apply the same in payment of Darrow's notes as they fell due. Pursuant to contract, Darrow executed to the defendant a chattel mortgage with a schedule of the lumber annexed, and the same was regularly filed. The mortgages were renewed and refiled in such form as to comply with the statute relating to chattel mortgages. It was held: (1) That a chattel mortgage is not rendered void as to creditors of the mortgagor by a provision authorizing him to sell the mortgaged property for cash or for notes to be accepted by the mortgagee, and apply the receipts from the sales toward the payment of the mortgage debt.

(2) That permission to use a portion of the proceeds of sales to purchase other property does not vitiate the mortgage, where it is coupled with a condition that the property so purchased shall be brought in and subjected to the mortgage lien by a renewal of the mortgage. (3) That an agreement, although outside of the mortgage and oral simply, that the mortgagor may use a portion of the proceeds of sales for his own benefit, avoids the mortgage, but that such an agreement must be proved; a mere expectation of one of the parties is not sufficient; it must appear that it had the conscious, concurrent assent of both. (4) That although one of the renewal mortgages was given for alleged sales, the proceeds whereof were not applied, it did not appear that any of the creditors represented by plaintiff were creditors at the time the mortgage was given, so as to have an adverse lien upon or right affecting the property existing at that time; and that it was competent for the parties to the mortgage to deal with each other in accordance with the actual condition of the indebtedness. (5) That two renewal mortgages executed within two months prior to the filing of the petition in bankruptcy, pursuant to the original contract, which antedated the two months, was not an unlawful preference within the meaning of the bankrupt act, although taken with knowledge on the part of the mortgagee that the mortgagor was insolvent, in the absence of evidence that he knew that they were executed in fraud of the provisions of the bankrupt act. (6) That this contract right to a lien upon newly acquired property was confined to such as was purchased with the avails of property originally mortgaged, and that if any of the property covered by the last two mortgages was not included in the prior mortgages, and was not paid for out of such avails, as to such portion the mortgages were within the prohibition of the bankrupt act.

These decisions render the mortgages in the case at bar invalid as to the material and the houseboat. It is apparent that the plant was, when the mortgages were made, a going business, and was intended by both mortgages to continue as such. The money was advanced for that purpose. In the second mortgage there is provision in terms that until default the mortgagor shall be suffered and permitted

"To remain in the full possession, control and use of said real and personal property * * * and to receive and use the tolls, income, rents, issues and profits thereof, and all moneys payable thereon and receivable or derivable therefrom, and shall likewise be suffered and permitted at all times and from time to time, as the proper management of the business of the Manufacturing Company may require, to sell, alter, exchange, and to repair, remove and replace any materials, supplies and stock, stores, machinery, tools and implements hereby mortgaged; provided always, that the security of said bonds shall not thereby be in any wise reduced or impaired."

The mortgage also contains this recital:

"Whereas it is necessary for the Manufacturing Company, in order to construct, equip, complete, finish and operate its manufacturing plant and transact its business and exercise its corporate rights, privileges and franchises, to borrow money to the extent hereinafter provided for."

The third mortgage recognizes that the mortgagor was organized and existing "for the purpose of doing a general manufacturing business," and recites that the company has, by resolution of its board of

directors, "determined to borrow from the said party of the second part for the purposes of its business the sum of eleven thousand ($11,000) dollars."

The evidence submitted by the mortgagee states:

"That on or about the 25th day of September, 1903, the said Company being greatly in need of funds, for a working capital, your petitioner Henry H. Derr loaned and advanced to the said Company the sum of $20,000."

There can be no doubt that the parties to both mortgages intended to permit all the stock of materials to be worked up into boats and sold, or sold in any way for the purposes of the business. To sell such stock in some form was the business of the company. It was to give substance and resources to the corporation, that it might make such sales, that the money was loaned.

The principal case is not distinguishable from Robinson v. Elliott, 89 U. S. 513, 22 L. Ed. 758, above considered. There the mortgage adjudged void empowered the mortgagee to sell "goods, wares, and merchandise," and supply the place thereof "with other goods," which should be subjected to the lien of the mortgage. In the principal case the very avowed object of the consideration of the mortgages was to enable the mortgagor to do that very thing, and in the second mortgage it is stated in terms. There the controversy was between the mortgagee and an assignee in bankruptcy. The parties to the present proceeding have the same relation to the property. The holding is paralleled in Southard v. Benner, 72 N. Y. 424, already stated. There it was held that an understanding between the parties to the mortgage, proved by the instrument itself or extrinsic evidence, that the mortgagor was to go on and sell part of the mortgaged lumber and use the money generally in his business, was fraudulent in law. The case of Brackett v. Harvey, 91 N. Y. 214, sustains the foregoing holdings, but holds that the facts present did not justify its application. In fact, the provision for the renewal of the mortgages, and their actual renewal before rights of the trustee in bankruptcy attached or could attach, distinguishes it from the former cases. The houseboat was a transient item of commerce, builded from a general stock of materials subject to transformation, consumption, and replenishment. The mortgage property in reference to the houseboat was shifting into new forms; first the contract for its construction, then the payment of $22,500 on the purchase price, then the boat itself, growing or grown to completion, and, finally, the debt of the purchaser for which the mortgagors could hold the boat, until the final payment therefor, and, last of all, the payment of the debt came to replace all other species of property related to this boat. Did the mortgages automatically seize these items as they appeared, and relax their grasp save as to the last item of $6,000? At the time of the bankruptcy the boat was completed; the purchaser had not discharged his obligation. The mortgagor was obligated to deliver the vessel; the purchaser was bounden to pay therefor. The boat was an item of merchandise created by the mortgagor to sell, which it was authorized by the very purpose, and hence consent of the mortgagees, to sell; its sale had been promised, and a large sum paid thereon. All the stock that went into it was alike free. If chattel

mortgages may lift and shift from items of merchandise devoted to sale by the intention of the mortgage, and then clasp and hold incoming property; if they may release all that passes out on the tide of commerce, and take to themselves all that returns, only to pass out again, and repeat this process through an indefinite succession of loosing and holding—it is quite evident (1) that the mortgagee and mortgagor are engaged in a commercial pursuit, wherein the former provides capital, at a fixed profit, and permits the subject of the mortgage to go forth untrammeled; (2) that such parties proclaim to those asked to lend credit on material and labor that the products of the business are free in commerce, while there is a snare ready to seize upon all these apparently free goods when creditors would take them for just debts.

As already stated, in the Roberts Case the mortgagor sold, and was permitted to sell, goods in a store; in the Benner Case he was empowered to sell lumber; in the case at bar it was contemplated that it should sell material and ships, and it was free to use and consume its stock of materials on hand for the purposes of its business. A mortgage on a pound of sugar and one on a ship should be alike invalid where the same power of disposition is given to the mortgagor. The money was loaned for the very essential purpose of vitalizing the business, so that its stock and material might be made into ships or other structures to be sold and repaired. Assume that money is loaned to a baker to enable him to conduct his business and to secure the loan, a mortgage is taken on the flour constituting the baker's stock in trade, and he is empowered to convert such flour into loaves of bread and to sell the same, would any one contend that the mortgage was an effectual lien upon either the flour or the loaves? In such case the parties constitute the material, and whatever results therefrom, articles of commerce, and the manifest intention is that they shall be sold free from the mortgage. In principle, there is no difference between material in a shipyard, authorized to be converted into boats and ships, and thereupon sold, and flour which is authorized by the parties to be converted into loaves of bread and sold. The magnitude or qualities of the article, or the structure into which it is intended that they shall enter, should not mislead the reason. The law has a common application. If articles are left with the mortgagor to sell in the course of his business and for the purposes of his business, then, under the decisions considered, the mortgage is invalid. If a rule exists, it should be applied logically.

These views lead to the conclusion that the petitioners are not entitled to the proceeds of the houseboat or the material. As regards the houseboat, it should be observed that, while the corporation held the title, the purchaser was entitled to receive it on completing the payment of the purchase price. Hence, it may be that equitably the mortgagor's interest was a chose in action, for which it held the title of the houseboat as security. Under N. Y. Security & Trust Co. v. Saratoga G. & E. Land Co., 159 N. Y. 137, 53 N. E. 758, 45 L. R. A. 132, and Platt v. Sea Beach R. Co., 170 N. Y. 456, 63 N. E. 532, such indebtedness would belong to the mortgagor.