ULRICH v. FREEDMAN et al.

(District Court, S. D. New York.  May 1, 1912.)

**1. EQUITY (§ 143*)—PLEADING—BILL—CERTAINTY.**

A bill based on a written contract, which recites that it is entered into for the purpose of carrying out a prior written agreement between the same parties, with certain modifications, and provides that the prior agreement is confirmed except where the two conflict, is demurrable for uncertainty, where it does not set out the first contract, which is essential to an understanding of the second.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 331, 335; Dec. Dig. § 143.*]

**2. CORPORATIONS (§ 573*)—CONTRACTS—CONSTRUCTION.**

Under a contract by which a corporation agreed to transfer its assets to a board of five trustees, four of whom it was to elect or appoint, a provision that, "in case of a vacancy in the board of trustees, a majority of the board shall have power to fill it," did not deprive the corporation of the power, acting through its stockholders, to appoint new trustees, where the entire four first appointed by it abandoned their trust and refused to act.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2293–2296; Dec. Dig. § 573.*]

**3. TRUSTS (§ 26*)—PLEADING—BILL—TITLE TO SUE.**

An allegation in a bill filed by complainant as a trustee that he was elected, with others, to succeed other trustees previously appointed, "who had abandoned their said trust and failed and neglected to perform the duties of their office as trustees," is one of fact, and not a conclusion of law, and is a sufficient allegation of complainant's title to maintain the suit.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 38; Dec. Dig. § 26.*]

**4. EQUITY (§ 143*)—PLEADING—BILL—SUFFICIENCY.**

A bill filed by a trustee to compel a restoration of trust property alleged to have been illegally transferred *held* not sufficiently definite and certain in its averments to disclose complainant's right to equitable relief.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 331, 335; Dec. Dig. § 143.*]

In Equity.  Suit by John O. Ulrich, trustee, against William H. Freedman, prime trustee, Joseph J. Mackeown, trustee, Irene M. Mulholland and Katherine Meier, administratrices of the estate of John Mulholland, deceased, Irene M. Mulholland and John Mulholland, incorporated.  On demurrer to bill.  Sustained.

John O. Ulrich and Allen & Chard, for complainant.

Ewing & Ewing, for defendants Irene M. Mulholland and another.

James R. Speers, for defendant John Mulholland, Inc.

MAYER, District Judge.  To the bill in equity herein demurrers have been interposed by the defendants Irene M. Mulholland and Katherine Meier, administratrices of the estate of John Mulholland, deceased, and Irene M. Mulholland individually and John Mulholland, Incorporated.

The bill alleges that on or about January 6, 1904, one Mulholland entered into a written agreement with International Finance & Devel-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, &.Rep'r Indexes

opment Company, a Delaware corporation (hereinafter called International). This 1904 agreement recites that prior to September 9, 1903, the affairs of International were in course of reorganization; that controversies had arisen between International and Mulholland which it was desirable should be settled, and that the parties entered into an agreement dated September 9, 1903, by the terms of which a large money-lending business, theretofore conducted by International in various cities, was sold to Mulholland; that the ownership by Mulholland of certain properties enumerated in the 1903 agreement, considered subject to possible disputes, was admitted to be in Mulholland; that, in consideration of the "conveyance" of the money-lending business and of the promises in the agreement recited, Mulholland executed his notes payable to International in the sum of $1,400,000; that, because part of the assets of the money-lending business sold to Mulholland was subject to the payment of certain bonded indebtedness and contingently liable for certain other debts of International, the latter bound itself to pay and save Mulholland harmless therefrom. The agreement further recites that it was provided by the 1903 agreement that, if International did not pay the sinking fund and interest on its bonded indebtedness when due, then Mulholland might pay these obligations himself, and, if he did so, that International had 30 days from such payments to pay or tender to Mulholland the amount expended by him, and if International failed so to do, Mulholland's notes should be returned to him; that International did not make the interest and sinking fund payments, and that the trustee, under the bond issue, was proceeding to declare the whole bonded indebtedness due and payable to avert which Mulholland had made these payments from time to time himself, and undertaken to exercise certain rights conferred by a forfeiture clause of the 1903 agreement, and since then had been in possession of the money-lending business claiming the same as his exclusive property, and claiming the right to have his notes canceled and returned to him by International.

It is further recited that this agreement of 1903 was subsequently ratified by the stockholders of International; that a receiver had been appointed on October 29, 1903, by the chancellor of the state of Delaware, and that International had made an alleged "conveyance" to the receiver of all its property; that on December 17, 1903, a meeting of the stockholders of the company was held at which Mulholland made a proposition that was unanimously accepted. This proposition contemplated the taking over by Mulholland of all the assets of International upon his agreement to pay its debts and to provide for the payment by way of liquidation of the preferred capital stock outstanding. This proposition was intended to settle all possible differences which had arisen between International and Mulholland under the 1903 agreement, and "to vest the title in Mulholland of the money-lending business conveyed by said (1903) agreement."

The preceding relations of the parties having thus been outlined by these recitals, International and Mulholland thereupon agreed that the title to the money-lending business and all the property and assets connected therewith, as conveyed by the agreement of September 9, 1903,

was "confirmed in said Mulholland," and the receiver of International was asked to apply to the Delaware court for authority to execute such papers as might be considered necessary for the "vesting and confirming of said title in the said Mulholland." Upon proof satisfactory to the receiver that all debts of International had been paid, he was requested to apply to the Delaware court for permission and authority "to convey to said Mulholland and execute proper instruments to effectuate said conveyance" all the property of International in his possession or under his control. In order that so far as International was concerned all its property and rights of any and every description (including a miscellaneous collection of real and personal property) were to "pass to and be confirmed in said Mulholland" so that International or any one claiming through it should be "forever estopped," it was expressly declared that all the International property or rights of action "are hereby sold, assigned, transferred, set over, and confirmed unto said Mulholland, his heirs and assigns." On his part Mulholland was to pay all the valid debts of the company due and to become due, including the bonded indebtedness, and was also to execute his obligations to the company, whereby he should bond himself to pay certain monthly installments until he paid in the aggregate an amount equal to the par value of the preferred stock of International, including so-called interim receipts then outstanding, to the amount of about $1,584,000. He was not under any obligation to liquidate the outstanding common stock. Upon Mulholland executing his obligations as above set forth, the directors of International were authorized and instructed to deliver to him for cancellation his notes amounting to $1,400,000 executed by him under the agreement of 1903. Mulholland was authorized to borrow on his bonds and to issue bonds against the assets of the money-lending business up to $500,000, which should be a lien prior to his obligations executed to liquidate the preferred stock. Subject to certain trust agreements and the right to pledge the assets of the money-lending business up to $500,000 to meet the principal and interest of bonds, Mulholland agreed that all the assets of which he thus became possessed should be "as and for a security" for his obligations to pay the debts of International, and to liquidate the preferred stock thereof.

For the purpose of securing payment of the Mulholland obligations and liquidating the capital stock of International, a board of five trustees was created, four of whom were to be nominated by International and one by Mulholland, the latter subject to the approval of the majority of the other trustees, and to be known as the prime trustee. The prime trustee was to be the active man, and to "hold in his possession in the name and behalf of the rest as collateral security" all the assets. Mulholland was to have full power to sell or exchange any of the property; the trustees, in this respect, bearing to him only advisory relations. The money obtained from such sales was to be invested in the money-lending business, and to be held by the prime trustee "as security," or, at the option of Mulholland, was to be expended by him in the payment of his several obligations under the agreement, so far as the same would go. In the event of exchange,

"the thing acquired by the exchange" was to be held by the trustee in place of the asset parted with. In case of default by Mulholland, the prime trustee was to enter and take charge of the money-lending business, and, together with his associate trustees, continue in possession and control until the default was made good, whereupon the prime trustee was to retire and turn over the business to Mulholland. The prime trustee was made removable by Mulholland, and, in such event, his place might be filled by Mulholland with the approval of the majority of the trustees present at any meeting called for that purpose. In case of a vacancy in the board of trustees a majority of the board was to have power to fill it. The stockholders and holders of the interim receipts in the preferred capital stock of International were to send in their certificates and receipts to the trustees who were to issue trustee's certificates therefor, and to hold the cerificates of stock and interim receipts thus turned in until the same were completely paid, whereupon the trustees were to cancel them. Mulholland was to pay his obligations to the prime trustee, who, acting in conjunction with his cotrustees, was to distribute the same from time to time pro rata to all holders of trustee's certificates. The assets of the money-lending business being distributed in many places, it was agreed that it should be sufficient in those cases for the prime trustee to have potential possession through subtrustees, who, if possible, were to be the cashiers or managers of the several offices and subject to removal by Mulholland. The prime trustee was not to interfere with Mulholland's action in this regard except in those instances where, in the judgment of the prime trustee the subtrustee ought not to have the custody of the assets and then the prime trustee was to so represent to Mulholland and agree upon some other person.

It was further agreed that, when Mulholland paid off his obligations to an amount equal to the agreed value of any of the assets, the trustees upon his request should order the prime trustee to deliver the assets to him and "convey the title thereof to him, to have and to hold to him, his heirs and assigns free and discharged from the debt and lien hereby created," and, in the event of his death, his wife or personal representative, within one year thereafter, should have the right of purchase on the same terms. This 1904 agreement having been executed and delivered by the parties a board of trustees and a prime trustee were duly appointed. In February, 1907, the prime trustee was removed, and the defendant Freedman duly appointed in his place.

The bill then alleges that on June 26, 1907, the complainant herein and three others were duly elected trustees by the stockholders of International to succeed the four trustees first appointed "who had abandoned their said trust, and failed and neglected to perform the duties of their office as trustees." Since June 26, 1907, two of these four have died, leaving the complainant and the defendant Mackeown as surviving trustees and the defendant Freedman as prime trustee. In June, 1905, Mulholland being in default, the original board of trustees took possession of the business. The complainant and associates presumably took the places of the original trustees on June

26, 1907. The business was conducted from 1905 until November 2, 1907, through the prime trustee. From June, 1905, to November 2, 1907, all the assets of the business were in the possession and custody of the various trustees through the prime trustee. In accordance with the terms of the 1904 agreement, Mulholland assigned and delivered to the prime trustee all the certificates of stock of a corporation known as Fairview Fluor-Spar Company, which were held as security by the prime trustee for the payment of the obligations of Mulholland. The assets of this company were subsequently transferred to Fairview Fluor-Spar & Lead Company (hereafter called Fairview), practically all of the stock of which became the property of the defendant Irene M. Mulholland, and she deposited this stock with the prime trustee to be held by him subject to the 1904 agreement. Under the 1904 agreement it was provided that, if Mulholland paid the trustees $100,000, they should convey to him the title to the Fairview property free and clear of the lien of the agreement, and, in pursuance thereof, Mulholland paid the trustees $35,000 on account, and caused Fairview to execute in favor of International its promissory note for $65,000. In August, 1906, Fairview was indebted to the business of Mulholland, then being conducted by the trustees, in the sum of $167,000 in round numbers, and on that day executed its promissory note therefor, and the same day executed a mortgage on its property to secure the payment of the notes for $65,000 and $167,000, and that mortgage was duly recorded. On November 2, 1907, Mulholland was adjudged a bankrupt by the District Court of the United States for the Eastern District of Illinois, and Freedman, who was then the prime trustee, was appointed receiver by the court of the assets of Mulholland. Neither International nor its stockholders authorized Freedman or the other trustees to surrender the assets in their possession, nor to waive the security or lien upon the same given by the agreement of 1904. Mulholland effected a composition which was approved by the District Court on April 2, 1908, which composition provided for the payment to the creditors of Mulholland out of the profits of the business conducted by the trustees under the 1904 agreement, and out of the profits of the Fairview Company. It is alleged that Mulholland did not pay his creditors "according to the terms of his composition which remains unperformed." Freedman, it is alleged, acting under misapprehension of his duties, delivered to Mulholland all the property and assets which he had in his possession as prime trustee and the notes and mortgage of Fairview above referred to.

In October, 1908, Mulholland caused to be incorporated under the laws of Delaware the defendant "John Mulholland, Incorporated," with an office in New York City, where its business is now being conducted, and John Mulholland, the individual, sold to John Mulholland, the corporation, all the assets which Freedman had delivered to him, except the certificate of stock of the Fairview, and received in payment therefor all the shares of the common capital stock of the Mulholland corporation, amounting to $250,000 par

value. This agreement of sale between Mulholland and John Mulholland, Incorporated, specifically provided that the sale and transfer was without prejudice to the rights of creditors of Mulholland, and further sets forth the execution of the agreement of January 6, 1904, and the dealings and transactions had by and between Mulholland on the one hand and International, its stockholders, and its trustees on the other. In December, 1910, Mulholland died intestate, and his wife and Katherine Meier were duly appointed administratrices, assumed their duties, and are administering the estate. It is alleged that the common capital stock of $250,000 par value aforesaid has been transferred to these administratrices. It is further alleged that John Mulholland, Incorporated, pays Mrs. Mulholland the sum of $633.33 monthly, for which she renders no services, and that the payment of these moneys is a fraud upon the beneficiaries under the agreement of 1904. It is further alleged that the Fairview has not paid any sum whatever upon its notes or its mortgage, and has been in default for a long time.

It is further alleged that the defendant Freedman can repossess himself of all the assets which he delivered to Mulholland under misapprehension, and that the complainant has made demand upon him to secure possession of such property and assets, including the certificates of stock of the Mulholland corporation and the Fairview certificates, which, as he claims, should now be in the custody of Freedman as prime trustee, but that Freedman declines to take such steps or proceedings as may be necessary to regain possession of such property and assets, unless he shall be so directed by the decree of a court of competent jurisdiction, and it is averred that, if Freedman is not ordered to repossess himself, then irreparable injury will result to the complainant and all other beneficiaries under the agreement. Thereupon the complainant prays (1) that the defendants may answer this bill; (2) that the usual subpœna issue; (3) that the defendants Irene M. Mulholland and Katherine Meier, as administratrices, be ordered and directed to assign and deliver to Freedman as prime trustee all certificates of the capital stock of John Mulholland, Incorporated, now standing in their names on the books of the company as administratrices, and that John Mulholland, Incorporated, be directed to issue new certificates of all stock of the corporation to Freedman as prime trustee; (4) that John Mulholland, Incorporated, be restrained from paying to Irene M. Mulholland any sum pending suit; (5) that Freedman, prime trustee, be ordered and directed forthwith to take all necessary proceedings to repossess himself of the property and assets by him delivered to Mulholland, the bankrupt, and also to repossess himself of the certificates of stock of the Fairview Company and to hold the same subject to the terms of the 1904 agreement; and (6) that the complainant may have such other and further relief as may seem proper and equitable.

This somewhat lengthy statement of the averments of the bill is necessary in order to point out the controversy, for the demurring defendants insist that (1) the bill shows on its face that the com-

plainant, for want of title, has not capacity to sue as trustee; (2) the bill shows that, by reason of the composition agreement, neither complainant nor Freedman has any title or lien; and (3) that the bill lacks equity. It is also claimed that there is not a proper allegation of diverse citizenship.

[1] 1. The bill is demurrable for its failure to set forth a copy of the agreement of September 9, 1903, or averments stating the terms thereof. This defect is apparent on the face of the bill, and, as the basic rights and relations of the parties are to be found in the agreement of January 6, 1904, the latter agreement cannot be clearly and fully understood without reference to the agreement of September 9, 1903. It may be that the agreement of 1903 does not change or affect the relations of the parties, and yet it is impossible for any one reading the bill to have any knowledge in this regard or to be able to arrive at any conclusion. Several references to the agreement of 1903 are made in the agreement of 1904, notably in paragraph "First" thereof, which confirms title in Mulholland, and provides:

"Said agreement of September 9th, 1903, is hereby confirmed except in so far as events have modified or rendered nugatory, and except in so far as this present agreement expressly or by necessary implication has amended, altered, or repealed it. It being understood that this agreement shall take precedence and control of any stipulations contained in said agreement of September 9th, 1903, where the same conflict."

It does not need extended discussion to point out the necessity of examining the agreement of 1903 to ascertain what provisions, if any, survive, and what, therefore, is the correct construction of the agreement of 1904. Marshall v. Turnbull (C. C.) 34 Fed. 827.

[2] 2. In respect of the title of the complainant, the demurring defendants argue that the allegation in paragraph "fourth" of the bill, that the then trustees abandoned their trust and failed and neglected to perform their duties, is a conclusion of law, and they say, further, that, under the terms of the agreement of 1904, there was no power in the stockholders of International to elect trustees to fill a vacancy, and that such power was conferred only upon a majority of the board of trustees. The clause, "in case of a vacancy in the board of trustees a majority of the board shall have power to fill it," is permissive, and does not confer exclusive authority. Only the corporation itself (International) could execute and give life to the agreement of 1904. It was probably not imagined that a situation might arise where all the trustees would abandon their trust, but clearly International by its agreement did not deprive itself of its original power and abrogate its right to appoint trustees. If, therefore, by abandonment, death, or resignation, all of the trustees appointable by International ceased to perform their duties, then clearly the International would still have power to appoint persons in their places. It is unnecessary that this should be specifically set forth in the agreement, because manifestly it was the intent of the agreement that International was at all times to be represented by trustees who, while not actively conducting the Mulholland business, should be a check upon the prime trustee, and should hold, with him, such title or possession as was accorded under

the agreement. I know of no way in which the company could act in the circumstances, except through its stockholders, and the mere fact that the holders of trustee's certificates were to be beneficiaries did not divest the company of its right to take corporate action in the only way ordinarily in which it could act; that is, through its stockholders.

[3] I think that the allegation as to abandonment and neglect is not a conclusion of law, but is an allegation of fact. The complainant is not called upon to recite his evidence. The word "abandoned" has a well-settled meaning, and, while very often an allegation of neglect unexplained is a conclusion of law, here the words "failed and neglected" may be construed, ejusdem generis, as meaning the same as abandoned. Of course, a trustee in his relations with his cestui que trust cannot escape responsibility by abandoning his trust but that is not the question here, and, in any event, the complainant is the de facto trustee, and has the right to sue.

It is further urged on this head that as International was not in the hands of its stockholders, but of a receiver, the stockholders had no power to elect trustees. The bill does not allege that the International was dissolved, and manifestly it was not. The Delaware receiver presumably had the usual power to conserve assets, but that power could not interfere with such action as the International (then corporately alive) might take through its stockholders, provided such action was not inconsistent with the receivership or contrary to law.

[4] 3. The demurring defendants claim that the composition effected by Mulholland with his creditors, and confirmed by the decree of the United States District Court in the bankruptcy proceeding, constitutes a bar to this action. If the title to the property in question was not in Mulholland but in Freedman, then, of course, the trustee in bankruptcy could not obtain title from Freedman by the latter's attempted transfer. To understand the situation, it is necessary to consider the status of the title to the property and also the possession of the assets. It is clear that the agreement of 1904 transferred to Mulholland the title of the money-lending business of International as well as of other property mentioned in the agreement. The property thus transferred was both real and personal, and in the agreement are used terms ordinarily found in instruments transferring personal and real property, as the case may be, such as "sold, assigned, transferred, set over and confirmed," and "conveyed," "conveyance," and "vested." Mulholland, thus holding the legal title by virtue of this 1904 agreement, thereupon conferred certain powers hereinbefore described upon the trustees and the prime trustee, and made a disposition which, in my opinion, was in law a chattel mortgage. This is ascertainable from the general character of the agreement, and in this connection it is significant that it was agreed that, when Mulholland discharged his obligations, the trustees, upon his request, were to order the prime trustee to deliver back the assets, and "convey the title thereof to him to have and to hold to him his heirs and assigns free and discharged from the debt and lien hereby created." These are words of well-settled meaning constantly and customarily used to indicate the transfer of title. Further, it was provided that, in the event

of Mulholland's death, his widow or personal representative should have the right to "purchase" back the assets. The word "purchase" clearly meant to buy from the trustees, under the agreement, what the trustees owned. If it was intended that the prime trustee should be merely a bailee, that intention could have been made clear by apt phraseology. I hesitate to express an opinion in this respect different from that entertained by the learned judge before whom the motion for a preliminary injunction was argued, but it may well be that he had other facts before him, while I have only the allegations of the bill. The provisions for the investment and the continuance as security of the proceeds of any property sold and the substitution of property acquired by exchange are well within the doctrine of Brackett v. Harvey, 91 N. Y. 214. There is nothing to show whether the agreement of 1904 was filed in the various jurisdictions where the property therein referred to was situated in accordance with the filing or recording laws of those jurisdictions, and it may be that the agreement of 1904 was void as to other creditors, but, as between the parties, it was a chattel mortgage, and therefore the trustees on November 2, 1907 (the date of the adjudication), were mortgagees in possession. If the instrument was not a chattel mortgage, then its legal effect was to pledge the property covered by it, and, in that case, Freedman on November 2, 1907, was the bailee of the property, which now included the Fairview capital stock. In some way not disclosed, the prime trustee was appointed the receiver in bankruptcy, thus accepting (whether as mortgagee in possession or bailee) a trust directly in conflict with the trust conferred upon and reposed in him by the 1904 agreement.

At this point the bill is somewhat hazy, and the proceedings before the bankruptcy court are by no means clearly set forth. It is said that the composition agreement provided for the payment to creditors out of the profits of the business conducted by the trustees under the 1904 agreement and out of the profits of the Fairview. Who was thereafter to conduct this business? Was its conduct remitted back to the relations of the 1904 agreement? What really did happen? Were profits paid to some extent in liquidation of the debts? It is alleged that Mulholland did not pay his creditors "according to the terms of his composition which remains unperformed," but the words of limitation "according to the terms of his composition" suggest the inquiry whether the creditors were otherwise satisfied, even though the composition was not carried out according to its terms. Presumably the complainant is bringing this action for substantial and not academic reasons, but the bill does not clearly show that the complainant represents beneficiaries. He recites that he brings this bill as trustee for International, and in behalf of its stockholders as individuals. But what stockholders?

While International acted corporately through its holders of common stock, yet the agreement seems to have been for the benefit of the holders of preferred stock. Do they complain? As the word "stockholders" may mean either preferred or common stockholders, I am unable to determine who it is that the complainant really represents. He may urge that the word "trustee" indicates that he is

representing the beneficiaries of the trust, but this is difficult to determine from the whole structure of the bill. Probably all this may be made clear if the bill should be redrawn, but the complainant, if the facts warrant, should show his equities on the face of the bill. If, however, it be assumed that the complainant, in his representative capacity, is suing for benefit of beneficiaries, then, even if Freedman were a bailee, the allegation in the bill that he was appointed receiver is enough to arouse suspicion, and to indicate that the court may have been imposed upon, and to cast doubt at once upon the regularity of the proceedings. Ordinarily a court will be presumed to have done what ought to have been done in every proceeding, but, where it is manifest that the situation was such as to arouse suspicion and that a person held two trust positions, obviously inconsistent, I doubt if any presumption of regularity can follow. If it is made clear that Freedman surrendered possession of these assets without right or authority, and that these assets ultimately came to Mulholland, who, by device, transferred them to his incorporated self, equity will not be keen to seize upon technicalities and to permit this property to evade its far reaching arm. It is true, once the jurisdiction of the bankruptcy court is submitted to, that it has power to determine claims and liens, but, where a claim is adverse and not colorable, its determination cannot as matter of right be made in a summary proceeding but must go to plenary suit, and therefore it is not at all certain that the bankruptcy court dealt with the liens or other rights of the trustees under the 1904 agreement. Here, then, we have the spectacle of a trustee in possession, whether under a chattel mortgage or as the holder of collateral security, surrendering, without right, assets to a bankrupt when the trustee in bankruptcy and the bankrupt and presumably every other party to the arrangement were obviously put on inquiry. If this was the situation, then a fraud was perpetrated which equity will go far to redress, and it will not confine the parties merely to an action against the faithless trustee for breach of trust. Finally, whatever of saving grace there may be in the reservation that the transfer from Mulholland to himself incorporated was without prejudice to rights of creditors inures now to the benefit of the creditors, who may look to a court of equity to aid in the restoration of assets.

4. It is not necessary to pass on the question of laches, for, if the bill should be redrawn, it will probably set forth the history of the transactions since April 2, 1908 (the date of the composition agreement), more fully and clearly than now appears. The question of laches can then be considered.

5. In conclusion, the complainant insists that, in any event, the allegations numbered 27, 28, and 29 are sufficient to sustain the bill.

In my opinion, this view cannot be upheld, because, in effect, these allegations are conclusions of law, and the mere assertion that the payments to defendant Irene M. Mulholland are a fraud is not enough to constitute an allegation of fact. I have gone beyond the strict requirements of an opinion, to the end that an amended bill may present clearly the actual situation.

For the reasons stated, the demurrers are sustained, and, as the bill needs amendment in the several respects indicated, the complainant may have leave to serve an amended bill within 20 days on payment of costs.